1  PAUL N. MURPHY
   (*pro hac vice* application to be filed)
2  pmurphy@effectus.legal
   LEE DOUGHERTY
3  (*pro hac vice* application to be filed)
   ldougherty@effectus.legal
4  KATHERINE A. SAPHIER
   (*pro hac vice* application to be filed)
5  ksaphier@effectus.legal
   **EFFECTUS PLLC**
6  1101 Connecticut Avenue, N.W.
   Suite 450
7  Washington DC 20036
   Tel: 202-888-2105
8  Fax: 202-509-0262

9  WILLIAM J. FRIMEL (Bar No. 160287)
   bill@sffwlaw.com
10 **SEUBERT FRENCH FRIMEL & WARNER LLP**
11 1075 Curtis Street
   Menlo Park, CA 94025
12 Tel: 650.322.3048
   Fax: 650.833.2976
13
   Attorneys for Plaintiff
14 RIVER FRONT SERVICES, INC.

15

16                    **UNITED STATES DISTRICT COURT**

17                  **NORTHERN DISTRICT OF CALIFORNIA**

18                          **SAN JOSE DIVISION**

19 RIVER FRONT SERVICES, INC.,
   a Virginia corporation,
20                                          CASE NO. _____
          Plaintiff,
21                                          **COMPLAINT**
       v.
22                                          1. Breach of Contract
   CAPELLA SPACE CORP.,                     2. Quantum Meruit
23 a Delaware corporation,                  3. Breach of Implied Contract
24        Defendant.                        **DEMAND FOR JURY TRIAL**
25

26

27

28

                                                                    COMPLAINT

Plaintiff River Front Services, Inc. ("Plaintiff" or "River Front"), by counsel, and for its Complaint against Capella Space Corp. ("Defendant" or "Capella") hereby states as follows:

## SUMMARY OF CLAIMS

In 2017, under a set of purchase orders and invoices, Plaintiff designed and built for Defendant sophisticated components for a small space craft that Defendant planned to launch. Defendant failed and refused to pay in full for the components. As a result of the failure to pay, Plaintiff suffered a loss of approximately $450,000.

## PARTIES

1.  River Front is a corporation organized and existing under the laws of the Commonwealth of Virginia and has its principal place of business in Chantilly, Virginia.

2.  Capella is a corporation organized and existing under the laws of the State of Delaware, and has its principal place of business in Palo Alto, California.

## JURISDICTION AND VENUE

3.  The Court has original jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

4.  The Court has personal jurisdiction over Capella because Capella's principal place of business is located in this judicial district.

5.  Venue is proper within this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this district and Capella resides in this district.

## FACTUAL ALLEGATIONS

6.  Capella is an early-stage company with the goal of providing satellite radar imaging information services from space utilizing synthetic aperture radar ("SAR"). It plans to launch Capella1, its first SAR satellite, in early 2018, and ultimately to deploy approximately thirty-six satellites.

7.  River Front is a Service-Disabled Veteran-Owned Small Business that specializes in developing technologies for space systems hardware and software, among other things.

8.   A Tape Deployment Assembly or "TDA" is a mechanical deployment device designed to extend and retract structural tape from a rolled state to an extended state and, more particularly, refers to a mechanical structural tape deployment device suitable for use in space and other environments. The manufactured assembly controls and manages the deployment of composite tapes used as booms on spacecraft.

9.   In early November 2016, Jeffrey Harvey, an engineering consultant to both parties, introduced River Front to Capella. Jeffrey Harvey, Toby Harvey, and TJ Harvey, had a contract with Capella to design the satellite's folding antenna.

10. Another engineering challenge was the design of a space-qualified TDA. In mid-November, River Front offered to provide a TDA, at cost and for delivery in January 2017, if Capella agreed to a long-term production contract or "purchase agreement."

11. Capella's Chief Executive Officer ("CEO") demurred on a purchase agreement, but he expressed interest in buying River Front's intellectual property to make the TDA space flight-worthy. He also wanted exclusive use of the IP.

12. The CEO stated that his company was "a start-up trying to add value to Capella as quickly as we can. Part of that means we are hungry for owning IP and/or gaining some sort of unfair advantage to keep the competitors out of our domain."

13. On November 16, he offered to purchase River Front's entire TDA system, including the tapes. The CEO suggested that he travel to River Front's facility in Virginia to discuss the purchase in further detail.

14. At the same time, and without Riverfront's knowledge or consent, Capella created a Preliminary Design Review ("PDR") slide deck describing, among other items, a River Front "proprietary Hybrid Tape Drive." River Front's logo appeared on the deck. River Front did not participate at all in the deck's creation and remained unaware of its existence until mid-2017.

15. On December 5, the parties met in Virginia. They discussed a proposal for River Front to supply the TDA's to Capella's entire program. River Front agreed to begin development of a space-qualified TDA if Capella would agree to purchase from River Front all the TDA's for thirty-six spacecraft. The project involved two-hundred sixteen TDA's over a ten-year

development period.

16. On December 8, Capella sent River Front an initial Memorandum of Understanding ("MOU") that outlined the parties' expectations for their long-term relationship. The memorandum referred to "tape deployment mechanisms" and "tapes," but mentioned no specifications for them.

17. The parties and other participants in the Capella 1 development project planned a PDR to discuss the satellite's requirements, general concept, system, and testing. Their agenda included discussions about the radar, mechanical, and thermal specifications for the spacecraft and radar system, but did not discuss or cover TDA requirements.

18. In December, River Front attended the actual review, held in Denver. It was limited, however, to accordion antenna waveguide issues. There was no discussion of the TDA or its specifications.

19.  River Front continued to press Capella for the long-term purchase agreement outlined in the MOU while River Front continued to self-fund development of a space-qualified TDA. The parties discussed only the general dimensions for size, weight, and the length of deployable composite tapes.

20.  In early to mid-January 2017, the parties addressed the actual mechanical operation of the TDA. The size of the electric motor dictated the force with which the TDA deployed the tape which, in turn, unfolded the antenna. However, the primary focus was getting the TDA within specific weight and volume constraints.

21. On January 7, Toby Harvey, the co-owner of TJ Hardy, sent an email to Capella confirming that the deployment force requirement for the TDA was 1.71lbf, and that 4lbf was an unreasonable requirement. Capella's subsequent response did not dispute that the deployment force requirement for the TDA was 1.71lbf. However, Capella forbade TJ Harvey from sharing any antenna design information with River Front.

22. On February 1, Capella sent River Front a "purchase agreement." The proposed agreement gave Capella the exclusive right to use River Front TDA's in space for ten years and a ten-year license for its intellectual property. River Front declined to sign this agreement as it

-3-

amounted to giving away all of River Front's IP and rights.

23. On February 12, River Front rejected the proposal and countered with a version that Capella ignored.

24. From early February through late March, River Front submitted five invoices to Capella for TDA's and tapes. They included models to demonstrate to Capella's investors, a non-flying prototype, 6 space-qualified flight-ready assemblies, 6 non-flight "engineering units," and a change order.

25. The invoices were devoid of technical specifications because Capella's purchase orders provided virtually none. They addressed only the external dimensions of the TDA, its electrical power requirements, and the length of the tapes to deploy the antenna.

26. In mid-February, Capella asked to buy a space-qualified TDA "to take the risk and uncertainty out." Within a week, in response to purchase orders that contained no specifications, River Front issued Capella two invoices for a non-flight Prototype and six space-qualified TDA's.

27. On February 14, River Front issued invoice "002" for the Prototype and carbon fiber tapes. There were no specifications, only that that the Prototype was not flight tested and had no flight hardware.

28. The next day, River Front withdrew invoice 002 because it did not want to sell the Prototype to Capella "until we are under contract." River Front had reason to believe that without a contract Capella could copy its designs without repercussions.

29. By February 23, River Front had completed the Prototype. River Front declined to deliver the Prototype to Capella without a purchase order and deposit. The next day, Capella approved a bank transfer to cover the cost of the Prototype.

30. In mid-February, River Front requested a purchase order for the space- qualified TDA's. River Front stressed that "time is closing for us to order all the parts" and that "the longer we wait to order parts the more difficult it becomes to meet your timelines."

31. On February 23, Capella sent a purchase order for the six space -qualified TDA's. It contained no specifications.

32. On February 24, River Front issued Special Order Invoice "003," a true and correct copy

of which is attached hereto as Exhibit A.  It set out the external dimensions of the TDA, its power requirements, the length of the tape, and the testing that River Front would conduct. River Front had no other specifications from Capella.

33. River Front's invoice 003 stated: "Seller's delivery dates are estimates only, Seller will make all commercially reasonable attempts to meet the buyers requested delivery date, and Seller is not liable for delays in delivery or for failure to perform due to causes beyond the reasonable control of the Seller, nor shall the carrier be deemed an agent of the Seller."

34. The delivery date was May 21, 2017.

35. The amount of special order invoice 003 was $330,000. Capella paid $132,000 upon acceptance, but not the balance due of $198,000.

36. In early March, Capella asked to review River Front's technical documents for input "on any requirements the system may need that are missing."

37. On March 7, FixT Products, a collaborator with Capella, asked River Front to provide its "latest requirement document," electrical and dimensional Interface Control Documents ("ICDs"), the "latest solid works model step file," and a development schedule.

38. FixT would act as "the primary contact concerning all schedule and technical updates."

39. FixT also asked River Front to provide "6 flight like units" prior to delivery of the space-qualified TDA's. They would be "completely flight just with non- flight motors" so that FixT could test the antenna without jeopardizing the flight units.

40. On March 8, the next day, River Front outlined its proposal to FixT for the development of six additional TDA Engineering Development Units ("EDU's") needed to assist Capella in antenna development.

41. To meet Capella's delivery expectations, River Front proposed to eliminate the following requirements: The EDU's would have no flight acceptance testing, non-flight motors, non-flight assemblies, non-flight manufacturing and quality assurance procedures, no surface treatments, and no documentation.

42. If Capella agreed to these conditions, River Front would issue the invoice.

43. The next day, Capella's CEO responded "Yes, please go ahead and send

me the invoice."

44. On March 10, River Front sent Invoice "004" for the non-flight EDU's. A true and correct copy of Invoice "004" is attached hereto as Exhibit "B."  The only specifications were the external dimensions of the unit, a 6 volt 3 amp motor, and the length of the tapes.

45. Invoice 004 eliminated all flight specifications, as River Front had proposed and Capella agreed.

46. Invoice 004 stated that River Front's estimated delivery of the EDU's was between May 1 and May 15.

47. Invoice 004 advised Capella that **"Acceptance of this Order will push the delivery date of Order #2017-003 to 22 June 2017."** (bold in original)

48. The total amount of Invoice 004 was $258,000. Capella paid $103,200 upon acceptance, but not the balance due of $154,800.

49.  In early March, Capella wanted to buy and "play with" a TDA motor. River Front identified Maxon, the manufacturer, and provided the part number.

50. In mid-March, Capella requested a "flight like motor control system" for EDU integration and testing.

51.  River Front alerted Capella that issues with the Maxon motors placed the EDU and space-qualified TDA delivery dates in "real jeopardy."

52. Maxon required eight to ten weeks to produce all the space-qualified motors, but agreed to supply them to River Front on a piecemeal basis as Maxon built each motor.

53. Capella acknowledged that River Front was "very busy", but the CEO insisted on delivery of the space-qualified TDA's before he would enter into a long- term purchase agreement.

54. On March 22, because of delays with the motors, River Front informed Capella that delivery of the EDU's would be extended from May 1-15 to June and delivery of the space-qualified flight units would be extended to July.

55. On March 23, River Front asked Capella whether the tape length had been changed. River Front had "heard through other discussions" that Capella had extended the length by approximately 22%.

56. River Front requested verification of the change and Capella's authorization to reorder longer feed tapes.

57. The same day, Capella asked River Front to increase the antenna deployment speed from six seconds, which it considered "extremely fast", to "something more like 30-60 seconds."

58. On March 24, River Front issued a Change Order for longer tapes and two Maxon motors. It was a rush order accompanied by an engineering analysis, and placed through Maxon.

59. The Change Order notified Capella that "RFS is not responsible for delivery issues from the manufacturer and will encourage and work with the manufacturer for an expedited delivery, but cannot be responsible for their delays and processes."

60. In early April, FixT and Capella requested from River Front updates on certain technical documents, specifically the Interface Control Document ("ICD"), and the TDA delivery schedule.

61. River Front again sent the "TDA Part Number Call Out", a diagram provided previously.

62. Capella already possessed all the technical information available to River Front. Still, River Front asked, "Please send me exactly what you need that you do not have."

63. On April 13, Capella cancelled its weekly all-hands conference calls about the antenna in favor of a one-on-one update with River Front only. This further isolated River Front from the flow of technical information.

64. On April 25, Capella's CEO told his Chief Technical Officer and both Jeffrey and Toby Harvey that "this issue keeps coming up so I just wanted to send a quick note and make it clear": the TDA specifications, what Capella was doing with them, anything associated with them, and any other internal Capella activities, were all proprietary and should not be shared or discussed outside of Capella, including with River Front.

65. In mid-May, Capella provided the tape dimensions that River Front had requested.

66. On May 19, Capella requested a curve/plot the deployment rate versus rpm. River Front replied that the gear ratio was 17:1, which did not satisfy Capella's request for the curve/plot.

67. On June 2, River Front updated Capella on the delivery schedule. An unplanned and unexpected delay in the arrival of newly-machined parts would impact the testing the space-qualified TDA's. Their delivery date would be extended for a minimum of two weeks.

68. On June 5, Capella stated that the June 1 delivery of the EDU's was necessary to its development schedule, claiming that the River Front's delay put Capella's entire program at risk.

69. If the EDU's fully functioned by the end of the week, Capella wanted them overnighted directly, without any testing. If not, Capella wanted a video of the units deploying "to assess the technology and determine how to proceed in a way that minimizes risk to [its] mission."

70. Capella directed River Front to proceed with development of the flight- qualified TDA's for delivery on June 22.

71. River Front replied that it would ship the EDU's as soon as possible, but due to an unscheduled change it was "still waiting on new parts from the machinist."

72. On June 15, Capella received the EDU's and River Front requested payment of the balance of its invoice.

73. On June 23, River Front notified Capella that the space-qualified TDA's were ready for shock and vibration testing the following week, and then final inspection and shipping. It also presented an option for a TDA with a larger motor, 10mm, if Capella wanted more margin than the current design allowed.

74. The same day, Capella expressed disappointment with the capabilities and build quality of the EDU's. It directed River Front to cease work on the space-qualified TDA's.

75. Capella claimed that the EDU's did not meet the tape deployment load requirement, that load capabilities and tape position were inconsistent from unit to unit, and that some EDU's did not deploy at all.

76. With respect to build quality, among other perceived issues, Capella complained that "Non-flight materials [were] used."

77. Capella also raised several questions about the materials and functionality of the space-qualified TDA's, and the documentation River Front would supply with them.

78. On June 27, River Front replied the EDU's were for an initial fit-check with other subsystems and to identify interface issues. River Front reminded Capella that Invoice 004 for the EDU was issued only after Capella agreed to eliminate all flight specifications and that documentation was not part of the EDU delivery.

1

**FIRST CAUSE OF ACTION**

2

**(Breach of Contract)**

3     79. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 78 as if fully set

4     forth herein.

5     80. Defendant's purchase orders to Plaintiff and Plaintiff's invoices to Defendant created

6     legally enforceable obligations.

7     81. Plaintiff fully performed its obligations to Defendant.

8     82. Defendant breached and violated its obligations. Defendant ordered the tape deployment

9     assemblies, which Plaintiff manufactured in accordance with the purchase orders and invoices,

10    and then refused to accept and pay for them.

11    83. Defendant's breach of its obligation to pay the balance due and owing caused injury to

12    Plaintiff.

13    84. As the result of Defendant's breach, Plaintiff has sustained damages of $449,730.00.

14

**SECOND CAUSE OF ACTION**

15

**(Quantum Meruit)**

16    85. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 78 as if fully set

17    forth herein.

18    86. From in or about November 2016 through June 2017, Plaintiff provided valuable technical

19    and engineering services to Defendant.

20    87. Defendant knew and appreciated that Plaintiff conferred a benefit on Defendant.

21    88. Plaintiff notified Defendant that it expected to be paid for the services.

22    89. Defendant did not pay Plaintiff for the services.

23    90. As the result, Defendant has been unjustly enriched by the receipt and enjoyment of

24    Plaintiff's services without payment.

25    91. Defendant accepted and retained the benefit of Plaintiff's services under circumstances

26    that make it inequitable for Defendant to retain the benefit without paying for its value.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## THIRD CAUSE OF ACTION

### (Breach of Implied Contract)

92. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 78 as if fully set forth herein.

93. In the alternative to an express contact, Plaintiff also pleads a cause of action for breach of implied-in-fact contract.

94. From in or about November 2016 through June 2017, the parties engaged in a course of conduct with every indicia of a contractual relationship. The conduct of Plaintiff and Defendant implied a contact between them, that is, Plaintiff would design and manufacture tape deployment assemblies for Defendant and Defendant would purchase them.

95.  Defendant, in breach of the parties' implied contract, accepted the engineering units, then refused to pay the contract price.  Defendant, in breach of the parties' implied contract, also declined to accept space-qualified units and refused to pay the contract price.

96. Plaintiff fully performed its obligations to Defendant.

97. Defendant's breach of its obligation to pay the balance due and owing caused injury to Plaintiff.

98. As the result of Defendant's breach, Plaintiff has sustained damages of $449,730.00.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff River Front Services prays for judgment as follows:

1. Compensatory damages in the amount of $449,730.

2. Post judgment interest.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

-10-

1    3. Such other and further relief as this Court deems just and proper.

2                                **JURY DEMAND**

3        Plaintiff demands a trial by jury on all issues so triable.

4

5    Dated:  January 25, 2018                **EFFECTUS PLLC**
                                             PAUL N. MURPHY
6                                            (*pro hac vice* application to be filed)
                                             pmurphy@effectus.legal
7                                            LEE DOUGHERTY
                                             (*pro hac vice* application to be filed)
8                                            ldougherty@effectus.legal
                                             KATHERINE A. SAPHIER
9                                            (*pro hac vice* application to be filed)
                                             ksaphier@effectus.legal
10                                           1101 Connecticut Avenue, N.W.
                                             Suite 450
11                                           Washington DC 20036
                                             Tel: 202-888-2105
12                                           Fax: 202-509-0262

13                                           **SEUBERT FRENCH FRIMEL & WARNER LLP**

14                                           By:    /s/ William J. Frimel
                                                    WILLIAM J. FRIMEL
15                                                  bill@sffwlaw.com
                                                    1075 Curtis Street
16                                                  Menlo Park, CA 94025
                                                    Tel: 650.322.3048
17                                                  Fax: 650.833.2976

18                                           Attorneys for Plaintiff
19                                           RIVER FRONT SERVICES, INC.

20

21

22

23

24

25

26

27

28

                                    -11-

# EXHIBIT "A"

# Special Order Invoice

*River Front Services, Inc.*

15049 Conference Center Drive
Suite 100
Chantilly, VA 20151
703-808-1229 (office)
571-296-0546 (cell)

INVOICE : 2017-003
DATE: February 24, 2017

**TO: PAYAM BANAZADEH**
**CAPELLA SPACE CORP.**
949 Industrial Ave,
Palo Alto, CA 94303
office: 650-334-7734|

**FOR:**
Space Qualified Tape Drive
Assemblies
**Purchase Order:**
**Project #:** 012017.01.003

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Tape Drive Assemblie with Carbon Fiber Tapes          x4 | | $55,000.00 | $220,000.00 |
|      Carbon Fiber Tapes shall extend 60 inches from end of Assembly | | | |
| Tape Drive Assemblie with Astro-Glass Fiber Tapes          x2 | | $ 55,000.00 | $110,000.00 |
|      Astro-Glass Tapes shall extend 40 inches from end of Assembly | | | |
| Tape Drive Assemblies (TDA) will fit into a 11cmx6.5xcmx5.2cm framework | | | |
| Tape Drive Assemblies will require 6v 3a power to drive assembly | | | |
| One (First) TDA flight unit will be tested to ProtoQualification requirements All following TDA flight units will be Acceptance tested only. | | | |
| Delivery date is 21 May 2017. | | | |

| | | |
|---|---|---|
| TOTAL | $330,000.00 |
| 40%  Due at Acceptance | $132,000.00 |
| Remainder Due at Delivery | $198,000.00 |

The acceptance of this invoice deems the Buyer's acceptance of River Front Services Standard Terms and Conditions of Sale which are attached below.  These terms and conditions ("Agreement") take precedence over Buyer's supplemental or conflicting terms and conditions to which notice of objection is hereby given.

Make all checks payable to **River Front Services, Inc.,**

**Thank you for your business!**



# Standard Terms and Conditions of Sale

These terms and conditions govern the sale of Products ("Product or Products") and provisions of services ("Services") by River Front Services, Inc. (RFS) and its affiliates ("Seller").  These terms and conditions ("Agreement") take precedence over Buyer's supplemental or conflicting terms and conditions to which notice of objection is hereby given.  Neither Seller's commencement of performance or delivery shall be deemed or construed as acceptance of Buyer's supplemental or conflicting terms and conditions.  RFS's failure to object to conflicting or additional terms will not change or add to the terms of this agreement.  Buyer's acceptance of the Products and/or Services from Seller shall be deemed to constitute acceptance of the terms and conditions contained herein.

1. **Orders:** All orders placed by Buyer are subject to acceptance by Seller.  Orders may not be cancelled or rescheduled without Seller's written consent.  All orders must identify the products, unit quantities, part numbers, applicable prices and requested delivery dates of the Products being purchased.  Seller may in its sole discretion allocate Product among its Customers.  Seller may designate certain Products and Services as non-cancelable, non- returnable ("NCNR") and the sale of such Products shall be subject to the special terms and conditions contained in Seller's Customer Acknowledgement or NCNR Product Form, which shall prevail and supersede any inconsistent terms and conditions contained herein or elsewhere.

2. **Prices:** The prices of the Products are those prices specified on the front of the invoice.  Pricing for undelivered Products may be increased in the event of an increase in Seller's cost, change in market conditions or any other causes beyond the Seller's reasonable control.   Price quotations shall automatically expire in thirty (30) days from the date issued, or as otherwise stated in the quotation.

3. **Taxes:** Unless otherwise agreed to in writing by Seller, all prices quoted are exclusive of transportation and insurance costs, duties, and all taxes including federal, state and local sales, excise and value added, goods and services taxes, and any other taxes.  Buyer agrees to indemnify and hold Seller harmless for any liability for tax in connection with the sale, as well as the collection or withholding thereof, including penalties and interest thereon.  When applicable, transportation and taxes shall appear as separate items on Seller's final invoice.

4. **Payment:** Payment may be made by check, money order, credit card, or wire transfer (all fees are borne by the Buyer).  Where Seller has extended credit to Buyer, terms of the Order shall not be validated until an initial payment of 40% of the Invoice (Order) cost is received by the Seller from the Buyer, at such date Seller will consider Buyer has entered into an agreement to purchase parts and products which are outlined on invoice, without offset or deduction. Final payment of all Orders will be finalized at time of delivery. On any past due invoice, Seller may impose interest at the rate of one and a half percent [1.5%] per standard business week.  If Buyer fails to make each payment when it is due, Seller reserves the right to change or withdraw credit and thereby suspend or cancel performance under any or all purchase orders or agreements in which Seller has extended credit to Buyer.  In the event of default by Buyer, Seller shall be entitled to costs, fees, and expenses, including but not limited to recovery of attorney fees, court costs and fees, and collections costs.

5. **Delivery and Title:** All deliveries will be made "EXWORKS" place of shipment. Title and risk of loss pass to the Buyer upon delivery of the Product to the carrier.  Seller's delivery dates are estimates only, Seller will make all commercially reasonable attempts to meet the buyers requested delivery date, and Seller is not liable for delays in delivery or for failure to perform due to causes beyond the reasonable control of the Seller, nor shall the carrier be deemed an agent of the Seller.   A delayed delivery of any part of an Order does not entitle Buyer to cancel other deliveries.

2/23/17 Rev. A



6. **<u>Returns, Refunds and Exchanges Policy:</u>**

**How to Return an Item:**
Item(s) must be in original condition to be returned, unless there is a manufacturer defect.
Customer must notify RFS within 2 business days of delivery date. In order to make sure the item
is returnable, please follow the steps below:

1. First, contact a RFS sales representative within 2 days of delivery date of item(s) by calling our
   toll-free number at **(703) 290-4817** or by emailing **info@riverfrontservicesinc.com**.

2. Second, if the item is approved for return, RFS will issue a Return Material Authorization
   (RMA) number. Once the RMA number is received, item must be returned within 14 days.
   RFS will provide the Customer with specific instructions on where to mail / return item(s) with
   the RMA number.  In most cases returned items will be shipped to the RFS warehouse located
   at:

   River Front Services, Inc
   15049 Conference Center Drive
   Suite 130
   Chantilly, VA 20151

3. Third, please include the signed RMA in the return package stating the reason for the return
   and the original receipt.

**Return Exceptions:**
The return should be in the original packaging and in unused condition except if approved
defective by a RFS representative via an RMA.

**Exchanges:**
If the item(s) is in new condition and in the original packaging, you may exchange the item(s) for
another item, unless the item is a SPECIAL ORDER item which will be annotated on the invoice.
Special Order items may require onsite technical assistance.  If failure or malfunction is due to
faulty manufacturing RFS will bear the cost of technical assistance at their expense and
arrangement.  If the failure or malfunction is due to the customer fault or misrepresentation the
Buyer/Customer will bear the cost.  Only a certified RFS technician is authorized to Customer will
not be subject to a restocking fee in this case, but without being a defective item, will still have to
pay return shipping. Items purchased from CDI that have been used or altered will not be accepted
for exchange and as stated in the Non-Cancelable and Non-Returnable items section, items noted
as NCNR cannot be exchanged.

**Non-Cancelable and Non-Returnable Items:**
Some Special Order items cannot be exchanged.  Customer should contact RFS at **(703) 290-4817**
or email **anthony.brown@riverfrontservicesinc.com** before making a purchase with questions
regarding the return policy. Special Order items identified as NCNR status (Non-cancelable and
Non-Returnable), will not be refundable or exchangeable.

**Return Freight / Restocking Fee:**
Orders which are returnable will entail a reasonable cancellation or restocking charges of a
minimum 15% of the part(s) cost, this will be deducted from the Customer refund.  RFS does not
refund the original shipping and handling that the Customer paid on the order. Customer must
prepay the return freight charges and RFS will not accept COD shipments.

2/23/17 Rev. A



**Refunds:**
RFS will notify Customer upon receipt and inspection of returned item(s) and will advise of refund status. Upon approval of return and refund, RFS will initiate a credit within 48 hours to the original method of payment. Credits to credit card can take 10 days to post to the account.

**Contact Us:**
Customer should contact River Front Services, Inc. with questions regarding returns.

7. **Limited Warranty:** Seller will transfer to Buyer any Product warranties and indemnities authorized by the manufacturer, including any transferable warranties and indemnities for intellectual property infringement.   Seller warrants to Buyer that Products purchased hereunder will conform to the applicable manufacturer's specifications for such products and that any value-added work performed by Seller on such Products will conform to applicable Buyer's specifications.  If Seller breaches this warranty, Buyer's remedy is limited to (at Seller's election) (1) refund of Buyer's purchase price for such Production (without interest), (2) repair of such Products, or (3) replacement of such Products; provided that such Products must be returned to Seller, along with acceptable evidence of purchase, within 20 days from date of delivery, transportation charges prepaid.  No warranty will apply if the Product has been subject to misuse, static discharge, neglect, accident or modification, or has been tampered with in any manner.

SAVE AS EXPRESSLY PROVIDED IN THESE TERMS AND CONDITIONS, ALL IMPLIED WARRANTIES, TERMS AND CONDITIONS (WHETHER STATUTORY OR OTHERWISE) ARE EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW.  IN PARTICULAR, SELLER MAKES NO WARRANTY RESPECTING THE MERCHANTABILITY OF THE PRODUCTS OR THEIR SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS AND WARRANTIES AGAINST LATENT DEFECTS.

8. **Limitation of Liabilities:**  BUYER SHALL NOT BE ENTITLED TO, AND SELLER SHALL NOT BE LIABLE FOR, LOSS OF PROFITS OR REVENUE, PROMOTIONAL OR MANUFACTURING EXPENSES, OVERHEADS, BUSINESS INTERRUPTION COST, LOSS OF DATA, REMOVAL OR REINSTALLATION COSTS, INJURY TO REPUTATION OR LOSS OF BUYERS, PUNITIVE DAMAGES, IPR INFRINGEMENT, LOSS OF CONTRACTS OR ORDERS OR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE.  BUYER'S RECOVERY FROM SELLER FOR ANY CLAIM SHALL NOT EXCEED THE PURCHASE PRICE PAID FOR THE AFFECTED PRODUCTS IRRESPECTIVE OF THE NATURE OF THE CLAIM WHETHER IN CONTRACT, TORT, WARRANTY, OR OTHERWISE. BUYER WILL INDEMNIFY, DEFEND AND HOLD SELLER  HARMLESS  FROM  ANY CLAIMS BASED ON (a) SELLER'S COMPLIANCE WITH BUYER'S DESIGNS, SPECIFICATIONS, OR INSTRUCTIONS, (b) MODIFICATION OF ANY PRODUCTS BY ANYONE OTHER THAN SELLER, or (c) USE IN COMBINATION WITH OTHER PRODUCTS.

9. **Export Control:**  Buyer certifies that it will be the recipient of the Products to be delivered by Seller. Buyer understands that the associated hardware, software, and/or technical data ("products") listed on their Purchase Order includes items that are governed by the U.S. Export Administration Regulations ("EAR"), by the U.S. Foreign Assets Control Regulations ("OFAC") and the International Traffic in Arms Regulations ("ITAR"). The Buyer understands that its sale



or distribution of said products may constitute exports or re-exports, and as such, must be in accordance with the requirements administered by Bureau of Industry and Security, Department of Treasury, and Department of State. It is understood that the country of ultimate destination, commodity classification, end-user, or end-use for any said products, could affect the applicable license requirements and exportability. The Buyer agrees to consult various resources, such as the EAR, ITAR, and OFAC, by the U.S. Department of Commerce's Bureau of Industry and Security's ("BIS") Export Counseling Division, and other appropriate Government Sources to ensure that the sales and distribution of said products, is processed in accordance with all applicable laws. The Seller will not transfer any export-controlled products to a non "U.S. Person" without the proper authority of the United States Government, and the buyers written approval.

10. **Use of Products:** Products sold by Seller are not designed, intended or authorized for use in life support, life sustaining, nuclear, or other applications in which the failure of such Products could reasonably be expected to result in personal injury, loss of life or catastrophic property damage. If Buyer uses or sells the Products for use in any such applications: (1) Buyer acknowledges that such use or sale is at Buyer's sole risk; (2) Buyer agrees that Seller and the manufacturer of the Products are not liable, in whole or in part, for any claim or damage arising from such use; and (3) Buyer agrees to indemnify, defend and hold Seller and the manufacturer of the Products harmless from and against any and all claims, damages, losses, costs, expenses and liabilities arising out of or in connection with such use or sale.

11. **Reverse Engineering:** The Buyer or user of the product will not reverse engineer, decompile, disassemble or otherwise attempt to derive the source code, techniques, processes, algorithms, hardware, know-how or other information from the binary code portions, hardware, and/or architecture of the RFS Technology (collectively, "Reverse Engineering") or permit or induce the foregoing. If however, directly applicable law prohibits enforcement of the foregoing, The Second Party may engage in Reverse Engineering solely for purposes of obtaining such information as is necessary to achieve interoperability of independently created software and hardware with the RFS Technology, or as otherwise and to the limited extent permitted by directly applicable law, but only if: (a) Reverse Engineering is strictly necessary to obtain such information; and (b) Second Party has first requested such information from RFS and RFS failed to make such information available (for a fee or otherwise) under reasonable terms and conditions. Any information supplied to or obtained by the Second Party under this section is confidential information of RFS subject to the obligations of Section 6 and 7, may only be used by Second Party for the purpose described in this section, and will not be disclosed to any third party or used to create any software or hardware which is substantially similar to the expression of the RFS Technology.

12. **Force Majeure:** Seller is not liable for failure to fulfill its obligations for any accepted Order or for delays in delivery due to causes beyond Seller's reasonable control including, but not limited to, acts of God, natural or artificial disaster, riot, war, strike, delay by carrier, shortage of Product, acts or omissions of other parties, acts or omissions of civil or military authority, Government priorities, changes in law, material shortages, fire, strikes, floods, epidemics, quarantine restrictions, acts of terrorism, delays in transportation or inability to obtain labor, materials or Products through its regular sources, which shall be considered as an event of force majeure excusing Seller from performance and barring remedies for non-performance. In an event of force majeure condition, the Seller's time for performance shall be extended for a period equal to the time lost as a consequence of the force majeure condition without subjecting Seller to any liability or penalty. Seller may, at its option, cancel the remaining performance, without any liability or penalty, by giving notice of such cancellation to the Buyer.



13. **Technical Assistance or Advice:**  If technical assistance or advice are requested by the Buyer, such assistance or advice will be charged to the buyer at the rate of $300 per hour plus travel and expenses. Sellers technical assistance will solely be associated with the use or working details of the product or device to which the Buyer purchased from the Seller.  Seller shall not be held liable for the content or Buyer's use of such technical assistance or advice nor shall any statement made by any of Seller's representatives in connection with the Products or Services constitute a representation or warranty, express or implied.

14.  **General:**  (a) The laws of the Common Wealth of Virginia will exclusively govern any dispute between Seller and Buyer, (b) Buyer may not assign this Agreement without the prior written consent of Seller. Seller or its affiliates may perform the obligations under this Agreement. This Agreement is binding on successor and assigns, (c) Products, including software or other intellectual property, are subject to any applicable rights of third parties, such as patents, copyrights and/or user licenses.

# EXHIBIT "B"

# Special Order
# Invoice NCNR

*River Front Services, Inc.*

15049 Conference Center Drive
Suite 100
Chantilly, VA 20151
703-808-1229 (office)
571-296-0546 (cell)

INVOICE : 2017-004
DATE: March 10, 2017

**TO: PAYAM BANAZADEH**
**CAPELLA SPACE CORP.**
949 Industrial Ave,
Palo Alto, CA 94303
office: 650-334-7734|

**FOR**: Engineering Unit
Tape Drive Assemblies
**Purchase Order:**
**Project #:** 012017.01.004

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Tape Drive Assemblie with Carbon Fiber Tapes          x4 | | $43,000.00 | $172,000.00 |
|     Carbon Fiber Tapes shall extend 60 inches from end of Assembly | | | |
| Tape Drive Assemblie with Astro-Glass Fiber Tapes          x2 | | $ 43,000.00 | $ 86,000.00 |
|     Astro-Glass Tapes shall extend 40 inches from end of Assembly | | | |
| Tape Drive Assemblies (TDA) will fit into a 11cmx6.5xcmx5.2cm framework | | | |
| Tape Drive Assemblies will require 6v 3a power to drive assembly | | | |
|     -    No Flight acceptance testing<br>    -    Non Flight motors<br>    -    Non Flight assemblies<br>    -    Non Flight manufacturing and QA procedures<br>    -    No surface treatments<br>    -    No documentation | | | |
| Estimated Delivery date is 1 to 15 May 2017. | | | |
| **Acceptance of this Order will push the delivery date of Order #2017-003 to 22 June 2017** | | | |

|  |  |
|---|---|
| TOTAL | $258,000.00 |
| 40%  Due at Acceptance | $103,200.00 |
| Remainder Due at Delivery | $154,800.00 |

The acceptance of this invoice deems the Buyer's acceptance of River Front Services Standard Terms and Conditions of Sale which are attached below.  These terms and conditions ("Agreement") take precedence over Buyer's supplemental or conflicting terms and conditions to which notice of objection is hereby given.

Make all checks payable to **River Front Services, Inc.,**

**Thank you for your business!**



## Standard Terms and Conditions of Sale

These terms and conditions govern the sale of Products ("Product or Products") and provisions of services ("Services") by River Front Services, Inc. (RFS) and its affiliates ("Seller"). These terms and conditions ("Agreement") take precedence over Buyer's supplemental or conflicting terms and conditions to which notice of objection is hereby given. Neither Seller's commencement of performance or delivery shall be deemed or construed as acceptance of Buyer's supplemental or conflicting terms and conditions. RFS's failure to object to conflicting or additional terms will not change or add to the terms of this agreement. Buyer's acceptance of the Products and/or Services from Seller shall be deemed to constitute acceptance of the terms and conditions contained herein.

1. **Orders:** All orders placed by Buyer are subject to acceptance by Seller. Orders may not be cancelled or rescheduled without Seller's written consent. All orders must identify the products, unit quantities, part numbers, applicable prices and requested delivery dates of the Products being purchased. Seller may in its sole discretion allocate Product among its Customers. Seller may designate certain Products and Services as non-cancelable, non- returnable ("NCNR") and the sale of such Products shall be subject to the special terms and conditions contained in Seller's Customer Acknowledgement or NCNR Product Form, which shall prevail and supersede any inconsistent terms and conditions contained herein or elsewhere.

2. **Prices:** The prices of the Products are those prices specified on the front of the invoice. Pricing for undelivered Products may be increased in the event of an increase in Seller's cost, change in market conditions or any other causes beyond the Seller's reasonable control. Price quotations shall automatically expire in thirty (30) days from the date issued, or as otherwise stated in the quotation.

3. **Taxes:** Unless otherwise agreed to in writing by Seller, all prices quoted are exclusive of transportation and insurance costs, duties, and all taxes including federal, state and local sales, excise and value added, goods and services taxes, and any other taxes. Buyer agrees to indemnify and hold Seller harmless for any liability for tax in connection with the sale, as well as the collection or withholding thereof, including penalties and interest thereon. When applicable, transportation and taxes shall appear as separate items on Seller's final invoice.

4. **Payment:** Payment may be made by check, money order, credit card, or wire transfer (all fees are borne by the Buyer). Where Seller has extended credit to Buyer, terms of the Order shall not be validated until an initial payment of 40% of the Invoice (Order) cost is received by the Seller from the Buyer, at such date Seller will consider Buyer has entered into an agreement to purchase parts and products which are outlined on invoice, without offset or deduction. Final payment of all Orders will be finalized at time of delivery. On any past due invoice, Seller may impose interest at the rate of one and a half percent [1.5%] per standard business week. If Buyer fails to make each payment when it is due, Seller reserves the right to change or withdraw credit and thereby suspend or cancel performance under any or all purchase orders or agreements in which Seller has extended credit to Buyer. In the event of default by Buyer, Seller shall be entitled to costs, fees, and expenses, including but not limited to recovery of attorney fees, court costs and fees, and collections costs.

5. **Delivery and Title:** All deliveries will be made "EXWORKS" place of shipment. Title and risk of loss pass to the Buyer upon delivery of the Product to the carrier. Seller's delivery dates are estimates only, Seller will make all commercially reasonable attempts to meet the buyers requested delivery date, and Seller is not liable for delays in delivery or for failure to perform due to causes beyond the reasonable control of the Seller, nor shall the carrier be deemed an agent of the Seller. A delayed delivery of any part of an Order does not entitle Buyer to cancel other deliveries.

2/23/17 Rev. A



6.  **Returns, Refunds and Exchanges Policy:**

**How to Return an Item:**
Item(s) must be in original condition to be returned, unless there is a manufacturer defect. Customer must notify RFS within 2 business days of delivery date. In order to make sure the item is returnable, please follow the steps below:

1.  First, contact a RFS sales representative within 2 days of delivery date of item(s) by calling our toll-free number at **(703) 290-4817** or by emailing **info@riverfrontservicesinc.com**.

2.  Second, if the item is approved for return, RFS will issue a Return Material Authorization (RMA) number. Once the RMA number is received, item must be returned within 14 days. RFS will provide the Customer with specific instructions on where to mail / return item(s) with the RMA number.  In most cases returned items will be shipped to the RFS warehouse located at:

    River Front Services, Inc
    15049 Conference Center Drive
    Suite 130
    Chantilly, VA 20151

3.  Third, please include the signed RMA in the return package stating the reason for the return and the original receipt.

**Return Exceptions:**
The return should be in the original packaging and in unused condition except if approved defective by a RFS representative via an RMA.

**Exchanges:**
If the item(s) is in new condition and in the original packaging, you may exchange the item(s) for another item, unless the item is a SPECIAL ORDER item which will be annotated on the invoice. Special Order items may require onsite technical assistance.  If failure or malfunction is due to faulty manufacturing RFS will bear the cost of technical assistance at their expense and arrangement.  If the failure or malfunction is due to the customer fault or misrepresentation the Buyer/Customer will bear the cost.  Only a certified RFS technician is authorized to Customer will not be subject to a restocking fee in this case, but without being a defective item, will still have to pay return shipping. Items purchased from CDI that have been used or altered will not be accepted for exchange and as stated in the Non-Cancelable and Non-Returnable items section, items noted as NCNR cannot be exchanged.

**Non-Cancelable and Non-Returnable Items:**
Some Special Order items cannot be exchanged.  Customer should contact RFS at **(703) 290-4817** or email **anthony.brown@riverfrontservicesinc.com** before making a purchase with questions regarding the return policy. Special Order items identified as NCNR status (Non-cancelable and Non-Returnable), will not be refundable or exchangeable.

**Return Freight / Restocking Fee:**
Orders which are returnable will entail a reasonable cancellation or restocking charges of a minimum 15% of the part(s) cost, this will be deducted from the Customer refund.  RFS does not refund the original shipping and handling that the Customer paid on the order. Customer must prepay the return freight charges and RFS will not accept COD shipments.

2/23/17 Rev. A



**Refunds:**
RFS will notify Customer upon receipt and inspection of returned item(s) and will advise of refund status. Upon approval of return and refund, RFS will initiate a credit within 48 hours to the original method of payment. Credits to credit card can take 10 days to post to the account.

**Contact Us:**
Customer should contact River Front Services, Inc. with questions regarding returns.

7.  **Limited Warranty:** Seller will transfer to Buyer any Product warranties and indemnities authorized by the manufacturer, including any transferable warranties and indemnities for intellectual property infringement.  Seller warrants to Buyer that Products purchased hereunder will conform to the applicable manufacturer's specifications for such products and that any value-added work performed by Seller on such Products will conform to applicable Buyer's specifications.  If Seller breaches this warranty, Buyer's remedy is limited to (at Seller's election) (1) refund of Buyer's purchase price for such Production (without interest), (2) repair of such Products, or (3) replacement of such Products; provided that such Products must be returned to Seller, along with acceptable evidence of purchase, within 20 days from date of delivery, transportation charges prepaid.  No warranty will apply if the Product has been subject to misuse, static discharge, neglect, accident or modification, or has been tampered with in any manner.

    SAVE AS EXPRESSLY PROVIDED IN THESE TERMS AND CONDITIONS, ALL IMPLIED WARRANTIES, TERMS AND CONDITIONS (WHETHER STATUTORY OR OTHERWISE) ARE EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW.  IN PARTICULAR, SELLER MAKES NO WARRANTY RESPECTING THE MERCHANTABILITY OF THE PRODUCTS OR THEIR SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS AND WARRANTIES AGAINST LATENT DEFECTS.

8.  **Limitation of Liabilities:**  BUYER SHALL NOT BE ENTITLED TO, AND SELLER SHALL NOT BE LIABLE FOR, LOSS OF PROFITS OR REVENUE, PROMOTIONAL OR MANUFACTURING EXPENSES, OVERHEADS, BUSINESS INTERRUPTION COST, LOSS OF DATA, REMOVAL OR REINSTALLATION COSTS, INJURY TO REPUTATION OR LOSS OF BUYERS, PUNITIVE DAMAGES, IPR INFRINGEMENT, LOSS OF CONTRACTS OR ORDERS OR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE.  BUYER'S RECOVERY FROM SELLER FOR ANY CLAIM SHALL NOT EXCEED THE PURCHASE PRICE PAID FOR THE AFFECTED PRODUCTS IRRESPECTIVE OF THE NATURE OF THE CLAIM WHETHER IN CONTRACT, TORT, WARRANTY, OR OTHERWISE. BUYER WILL INDEMNIFY, DEFEND AND HOLD SELLER HARMLESS FROM ANY CLAIMS BASED ON (a) SELLER'S COMPLIANCE WITH BUYER'S DESIGNS, SPECIFICATIONS, OR INSTRUCTIONS, (b) MODIFICATION OF ANY PRODUCTS BY ANYONE OTHER THAN SELLER, or (c) USE IN COMBINATION WITH OTHER PRODUCTS.

9.  **Export Control:** Buyer certifies that it will be the recipient of the Products to be delivered by Seller. Buyer understands that the associated hardware, software, and/or technical data ("products") listed on their Purchase Order includes items that are governed by the U.S. Export Administration Regulations ("EAR"), by the U.S. Foreign Assets Control Regulations ("OFAC") and the International Traffic in Arms Regulations ("ITAR"). The Buyer understands that its sale



or distribution of said products may constitute exports or re-exports, and as such, must be in accordance with the requirements administered by Bureau of Industry and Security, Department of Treasury, and Department of State. It is understood that the country of ultimate destination, commodity classification, end-user, or end-use for any said products, could affect the applicable license requirements and exportability. The Buyer agrees to consult various resources, such as the EAR, ITAR, and OFAC, by the U.S. Department of Commerce's Bureau of Industry and Security's ("BIS") Export Counseling Division, and other appropriate Government Sources to ensure that the sales and distribution of said products, is processed in accordance with all applicable laws. The Seller will not transfer any export-controlled products to a non "U.S. Person" without the proper authority of the United States Government, and the buyers written approval.

10. **Use of Products:** Products sold by Seller are not designed, intended or authorized for use in life support, life sustaining, nuclear, or other applications in which the failure of such Products could reasonably be expected to result in personal injury, loss of life or catastrophic property damage.  If Buyer uses or sells the Products for use in any such applications: (1) Buyer acknowledges that such use or sale is at Buyer's sole risk; (2) Buyer agrees that Seller and the manufacturer of the Products are not liable, in whole or in part, for any claim or damage arising from such use; and (3) Buyer agrees to indemnify, defend and hold Seller and the manufacturer of the Products harmless from and against any and all claims, damages, losses, costs, expenses and liabilities arising out of or in connection with such use or sale.

11. **Reverse Engineering:** The Buyer or user of the product will not reverse engineer, decompile, disassemble or otherwise attempt to derive the source code, techniques, processes, algorithms, hardware, know-how or other information from the binary code portions, hardware, and/or architecture of the RFS Technology (collectively, "Reverse Engineering") or permit or induce the foregoing. If however, directly applicable law prohibits enforcement of the foregoing, The Second Party may engage in Reverse Engineering solely for purposes of obtaining such information as is necessary to achieve interoperability of independently created software and hardware with the RFS Technology, or as otherwise and to the limited extent permitted by directly applicable law, but only if: (a) Reverse Engineering is strictly necessary to obtain such information; and (b) Second Party has first requested such information from RFS and RFS failed to make such information available (for a fee or otherwise) under reasonable terms and conditions. Any information supplied to or obtained by the Second Party under this section is confidential information of RFS subject to the obligations of Section 6 and 7, may only be used by Second Party for the purpose described in this section, and will not be disclosed to any third party or used to create any software or hardware which is substantially similar to the expression of the RFS Technology.

12. **Force Majeure:** Seller is not liable for failure to fulfill its obligations for any accepted Order or for delays in delivery due to causes beyond Seller's reasonable control including, but not limited to, acts of God, natural or artificial disaster, riot, war, strike, delay by carrier, shortage of Product, acts or omissions of other parties, acts or omissions of civil or military authority, Government priorities, changes in law, material shortages, fire, strikes, floods, epidemics, quarantine restrictions, acts of terrorism, delays in transportation or inability to obtain labor, materials or Products through its regular sources, which shall be considered as an event of force majeure excusing Seller from performance and barring remedies for non-performance.  In an event of force majeure condition, the Seller's time for performance shall be extended for a period equal to the time lost as a consequence of the force majeure condition without subjecting Seller to any liability or penalty.  Seller may, at its option, cancel the remaining performance, without any liability or penalty, by giving notice of such cancellation to the Buyer.



13. **Technical Assistance or Advice:**  If technical assistance or advice are requested by the Buyer, such assistance or advice will be charged to the buyer at the rate of $300 per hour plus travel and expenses. Sellers technical assistance will solely be associated with the use or working details of the product or device to which the Buyer purchased from the Seller.  Seller shall not be held liable for the content or Buyer's use of such technical assistance or advice nor shall any statement made by any of Seller's representatives in connection with the Products or Services constitute a representation or warranty, express or implied.

14. **General:**  (a) The laws of the Common Wealth of Virginia will exclusively govern any dispute between Seller and Buyer, (b) Buyer may not assign this Agreement without the prior written consent of Seller. Seller or its affiliates may perform the obligations under this Agreement. This Agreement is binding on successor and assigns, (c) Products, including software or other intellectual property, are subject to any applicable rights of third parties, such as patents, copyrights and/or user licenses.